IN THE UNITED STATES DISTRICT COURT

DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UBS BANK USA,<br><br>　　　　　　　　Plaintiff,<br><br>vs.<br><br>WOLSTEIN BUSINESS ENTERPRISES<br>L.P. et al.,<br><br>　　　　　　　　Defendants. | **FINDINGS OF FACT<br>AND<br>CONCLUSIONS OF LAW**<br><br>Case No. 2:08-cv-0911 CW-SA<br><br>District Judge Clark Waddoups |

## INTRODUCTION

UBS Bank USA ("Bank") brought this action against Wolstein Business Enterprises L.P., S.A.W. Trust, Albert T. Adams, as Trustee of the S.A.W. Trust and Wolstein Business Enterprises, Inc. (collectively "Defendants") to collect a deficiency on an outstanding loan that remained after the Bank liquidated the account that provided collateral for the loan. The matter was tried to the court on April 26 and 27, 2010 after which the parties submitted closing briefs. Closing argument was heard on June 28, 2010. For the reasons set forth hereafter, the court enters judgment in favor of the Bank.

## FINDINGS OF FACT

**A.      The Parties and Claims**

1.      The Bank is a federally regulated, Utah industrial bank with its principal place of business in Salt Lake City, Utah. It is qualified to do business in the State of Utah. (Pretrial Order, Uncontroverted Facts, ¶ 1 (Apr. 12, 2010) (Dkt. No. 53) (hereinafter "Uncontroverted Facts")).

2.     The Bank filed a complaint against Wolstein Business Enterprises L.P. ("Wolstein L.P."), a limited partnership organized under the laws of the State of Delaware, seeking $853,453.57, plus interest, attorney's fees and costs, that remained due and owing on certain loans that the Bank had made to Wolstein L.P. and that Wolstein L.P. had failed and refused to repay.

3.     The Bank alleges that Wolstein L.P. breached its Credit Line Agreement, executed on or about March 3, 2006 and pursuant to which it had borrowed over $20 million from the Bank. The Bank further alleges claims for breach of the covenant of good faith and fair dealing, unjust enrichment and account stated.

4.     On or about May 26, 2009, with leave of the court, the Bank filed a First Amended Complaint alleging, among other things, that, as current and/or former general partners of Wolstein L.P., S.A.W. Trust and Wolstein Businesses Enterprises, Inc. were and are jointly and severally liable for the debts of Wolstein L.P.

5.     Defendant S.A.W. Trust is a trust organized under the laws of the State of Delaware and based in the State of Ohio. Defendant Albert T. Adams was, at all times relevant to this litigation, the Trustee of S.A.W. Trust. (Uncontroverted Facts, ¶ 3.)

6.     S.A.W. Trust was the general partner of Wolstein L.P. from December 18, 2002 to February 1, 2007 (Uncontroverted Facts, ¶ 5; Ex. P-2, at 36; Ex. P-3)[1] and executed the Credit Line Agreement as general partner of Wolstein L.P.  (Ex. P-1, at 4.)  Defendants did not notify the Bank that S.A.W. Trust withdrew as general partner of Wolstein L.P. on February 1, 2007.  (Testimony of Steven Stewart, at 19:9–18) (hereinafter "Stewart Testimony"); Testimony of Scott Wolstein, at

---

[1]  "Ex." refers to exhibits that were introduced into evidence at the trial of this matter.

97:7–14 (hereinafter "Wolstein Testimony").)[2] As of February 1, 2007, the balance due and owing to the Bank on the Loans was $20,304,091. (Ex. P-4, February 2007 Account Statement; Stewart Testimony, at 27:17–19.)

7. Defendant Wolstein Business Enterprises, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of Ohio. (Uncontroverted Facts, ¶ 4.) Defendant Wolstein Business Enterprises, Inc. has been the general partner of Wolstein L.P. since February 1, 2007. (Uncontroverted Facts, ¶ 6.)

8. On or about June 25, 2009, Defendants answered the First Amended Complaint, again asserting affirmative defenses, but no counterclaims or specific allegations of wrongdoing against the Bank.

**B.     The Credit Line Agreement**

9. Under the Credit Line Agreement, Wolstein L.P. requested and received a demand revolving line of credit by which the Bank, upon Wolstein L.P.'s request, could in its sole and absolute discretion, make one or more advances (the "Loans") to Wolstein L.P. (Uncontroverted Facts, ¶ 8; Ex. P-1, at 6, ¶ 2(a).) Under the terms of the Credit Line Agreement the Bank had the right, at any time, to demand that the Loans, plus accrued interest, be immediately repaid. Specifically, the agreement provided:

> THE BORROWER UNDERSTANDS AND AGREES THAT UBS BANK USA MAY DEMAND FULL OR PARTIAL PAYMENT OF THE CREDIT LINE OBLIGATIONS, AT ITS SOLE OPTION AND WITHOUT CAUSE, AT ANY TIME, AND THAT NEITHER FIXED RATE ADVANCES NOR VARIABLE RATE ADVANCES

---

[2] The page and line numbers refer to the transcript of the trial of this matter prepared by Laura Robinson, CSR, PRP, CP.

ARE EXTENDED FOR ANY SPECIFIC TERM OR DURATION.

(Ex. P-1, at 4, ¶ B; *see also*, Ex. P-1, at 6, ¶ 2(b); Ex. P-1, at 10, ¶ 10(b) (emphasis in original).)

10.     The Credit Line Agreement also expressly provided that "Each Variable Rate Advance will be due and payable ON DEMAND."  (Ex. P-1, at 7, ¶ 5(b) (emphasis in original).) The Credit Line Account Application had boxes to be checked indicating whether the advances would be at a variable or fixed rate.  The box for variable rate was checked.  (Ex. P-1, at 1; Stewart Testimony, at 21:14–16.)  Defendants have not disputed the Bank's right to demand repayment of the Loans at any time.  (Uncontroverted Facts, ¶ 8; Wolstein Testimony, at 98:4–6.)

11.     In addition to authorizing the Bank to demand payment at any time, the Credit Line Agreement also provided that Wolstein L.P. may elect to repay the Loans "at any time, in whole or in part, without penalty."  (P-1, at 8, ¶ 6(a).)  Scott Wolstein testified that he was aware that Defendants could repay the loan at any time without penalty.  (Wolstein Testimony, at 99:15–20.)

**(ii)     The Loans Were Secured and Collateralized by Assets Maintained in Certain Brokerage Accounts**

12.     The Loans were secured and collateralized by assets (the "Collateral") that Wolstein L.P. maintained in certain brokerage accounts at UBS Financial Services Inc. ("UBS Financial Services").[3]

13.     In consideration for the Loans, Wolstein L.P. granted to the Bank "a first priority lien and security interest" in the Collateral pursuant to the Credit Line Agreement.  (Ex. P-1, at 8, ¶ 8.)

---

[3]  UBS Financial Services, which is not a party to this action, is a Delaware corporation having a principal place of business in New Jersey and is engaged in the business of providing securities brokerage services. The Bank and UBS Financial Services are legally separate and distinct corporate entities. The former is a federally regulated bank based in Utah; the latter is a securities brokerage firm incorporated in Delaware.

14.     The Collateral consisted primarily of shares of Developers Diversified Realty Corporation ("DDR"), a real estate investment company of which Scott Wolstein was the Chief Executive Officer and a substantial shareholder.  Shares of DDR were and are publicly traded on the New York Stock Exchange.  (Stewart Testimony, at 22:8–23:2.)

15.     Scott Wolstein has been the Chief Executive Officer and/or Executive Chairman of DDR since 1993.  (Wolstein Testimony, at 63:16–64:8.)  Mr. Wolstein holds an M.B.A. and is also an attorney.  (Wolstein Testimony, at 93:7–16.)

**(iii)     The Bank Had the Right to Liquidate the Collateral Without Notice**

16.     Under the Credit Line Agreement, the Bank had the right to liquidate the Collateral without notice to Wolstein L.P.  (Ex. P-1, at 10, ¶ 10(a).)

17.     The provision granting the Bank the right to liquidate allowed the Bank to sell the Collateral upon a decline in the value of the Collateral:

> **THE BORROWER UNDERSTANDS THAT BORROWING USING SECURITIES AS COLLATERAL ENTAILS RISKS. SHOULD THE VALUE OF THE SECURITIES IN THE COLLATERAL ACCOUNT DECLINE BELOW THE REQUIRED COLLATERAL MAINTENANCE REQUIREMENTS, UBS BANK USA MAY REQUIRE THAT THE BORROWER POST ADDITIONAL COLLATERAL, REPAY PART OR ALL OF THE LOAN AND/OR SELL THE BORROWER'S SECURITIES.  ANY REQUIRED LIQUIDATIONS MAY INTERRUPT THE BORROWER'S LONG-TERM INVESTMENT STRATEGIES AND MAY RESULT IN ADVERSE TAX CONSEQUENCES.**

(Ex. P-1, at 4, ¶ D (bold and caps in original).)

18.     By executing the Credit Line Agreement, Wolstein L.P. also agreed that the Bank was authorized to sell the Collateral at its "sole and absolute discretion by public sale on any exchange

or market where business is then usually transacted."  (Ex. P-1, at 10, ¶ 10(a); *see also* Ex. P-1, at 4, ¶ D.)

19.    As the Collateral (i.e., the DDR shares) was customarily sold on a recognized exchange (i.e., the New York Stock Exchange), the Credit Line Agreement expressly authorized the Bank to sell the Collateral "without providing the [borrower] with prior notice of the sale."  In this regard, the Credit Line Agreement provided that:

> Any Collateral that may decline speedily in value or that is customarily sold on a recognized market or exchange may be sold without providing the Loan Party with prior notice of the sale.
> . . .
>
> In addition to the Bank's rights under this Agreement, the Bank will have the right to exercise any one or more of the rights and remedies of a secured creditor under the Utah Uniform Commercial Code, as then in effect.

(Ex. P-1, at 10, ¶ 10(a); Stewart Testimony, at 58:21–59:13.)

### (iv)    The Credit Line Agreement Could Not Be Modified Except in Writing by an Authorized Officer of the Bank

20.    By executing the Credit Line Agreement, Wolstein L.P.  also expressly agreed that "this Agreement may be amended only by the Bank at any time by sending written notice signed by an authorized officer of the Bank of an amendment to the Borrower."  (Ex. P-1, at 11, ¶ 15.)

21.    The Credit Line Agreement further expressly provided that "this Agreement may not be amended orally."  The Agreement further provided that either the borrower or the bank may waive compliance with any provision, but that such a waiver must be in writing.  (Ex. P-1, at 11, ¶ 15.)

22.    Other than the Credit Line Agreement, there was no written agreement between Defendants and the Bank.  Moreover, there was no written agreement pursuant to which the Bank

limited, waived or otherwise modified any of its rights and remedies under the Credit Line Agreement. (Stewart Testimony, at 31:1–7; Wolstein Testimony, at 103:2–4.)

**(v)     The Terms and Conditions of the Credit Line Agreement Are Undisputed**

23.     Steven Stewart, the Chief Credit Officer of the Bank since 2003, testified that the Bank would not have loaned Wolstein L.P. any money if Wolstein L.P. had not agreed to all of the terms and conditions of the Credit Line Agreement. (Stewart Testimony, at 15:12–14.)

24.     Defendants have not disputed (and have not offered any evidence to dispute) the clear, express and unambiguous terms and conditions of the Credit Line Agreement.

25.     By having its representative sign the Credit Line Agreement, Wolstein L.P. acknowledged that it had "received and read" a copy of the Credit Line Agreement and "agreed to be bound by the terms and conditions" contained in the Credit Line Agreement. (Ex. P-1, at 4, ¶ A.)

**C.     The Loans**

26.     Almost immediately after Wolstein L.P. executed the Credit Line Agreement and agreed to all of its terms and conditions, Wolstein L.P. began borrowing substantial sums of money from the Bank. On or about March 22, 2006, Wolstein L.P. requested and received a loan of $13,903,602 from the Bank. (Ex. P-4, March 2006 Account Statement; Stewart Testimony, at 26:7–13.)

27.     Wolstein L.P. continued to borrow money from the Bank under the Credit Line Agreement. The following month (April 2006), Wolstein L.P. borrowed an additional $5 million from the Bank. (Ex. P-4, April 2006 Account Statement; Stewart Testimony, at 26:14–17.)

28.     At various points in 2006, 2007 and 2008, Wolstein L.P. requested and received additional monies from the Bank such that the outstanding balance on the Loans exceeded $20

million.  (Ex. P-4.)

29.     As of February 1, 2007 (the day S.A.W. Trust changed from being the general partner of Wolstein L.P. to being a limited partner), the balance due and owing to the Bank on the Loans was $20,304,091.  (Ex. P-4, February 2007 Account Statement; Stewart Testimony, at 27:17–19.)

30.     Defendants have not disputed the amount of the Loans that Wolstein L.P. requested and received as set forth herein and as reflected in more detail in Exhibit P-4, the monthly loan account statements.

31.     Defendants have not disputed that the Loans were made pursuant to the Credit Line Agreement.

**D.     The Value of the Collateral Declined**

32.     In October 2008, there was "severe stress and turmoil" in the financial markets. (Stewart Testimony, at 28:14–29:2.)  Mr. Stewart, the Chief Credit Officer of the Bank who has been in the industry for 25 years, testified that it was the most volatile equities markets that he had ever experienced.  (Stewart Testimony, at 28:24–29:2.)  Similarly, Dennis Drescher, a Branch Manager at UBS Financial Services who has been in the industry for over 37 years, testified that it was the "single most volatile time [he had] ever witnessed."  (Testimony of Dennis Drescher, at 116:10–22 (hereinafter ("Drescher Testimony")).)

33.     Mirroring the turmoil in the broader financial markets, the price of DDR shares rapidly declined in October 2008.  The DDR share price decreased from $31.35 on October 1, 2008 to $4.01 on October 23, 2008, a loss of over 87 percent of its value in less than a month.  (Ex. P-9.)

34.     In October 2008, Dennis Drescher and Scott Wolstein had a number of conversations regarding the decrease in the value of the Collateral and the Bank's rights with regard to that

Collateral. During these conversations, Mr. Drescher expressly reminded Mr. Wolstein that the Loans were issued by the Bank and not UBS Financial Services. (Drescher Testimony, at 117:10–13; 130:20–131:4.) Mr. Drescher testified:

> Q.    Did you explain to Mr. Wolstein that this was not UBS Financial Services' loan, but that it was the Bank's loan?
>
> A.    Yes, we did have that conversation.

(Drescher Testimony, at 117:10–13.)

35.    Mr. Drescher also advised Mr. Wolstein that the Bank, not UBS Financial Services, made all decisions regarding liquidating the Collateral in connection with loan calls. (Drescher Testimony, at 117:14–17.) Mr. Drescher testified:

> Q.    Did you tell Mr. Wolstein that any decisions about liquidating the collateral would have to be made by the Bank?
>
> A.    Yes.

(Drescher Testimony, at 117:14–17.)

36.    Mr. Drescher never advised Mr. Wolstein that he was authorized to amend the Credit Line Agreement or make other decisions regarding the Loans. (Drescher Testimony, at 117:5–9.) Mr. Drescher testified:

> Q.    During any of these conversations, Mr. Drescher, did you ever tell Mr. Wolstein that you were authorized by the Bank to amend or modify the Credit Line Agreement?
>
> A.    No.

(Drescher Testimony, at 117:5–9.)

37.    Mr. Drescher was not authorized by the Bank to modify or amend the Credit Line

Agreement.  In this regard, Mr. Stewart testified:

> Q.    Mr. Stewart, were employees of UBS Financial Services, Inc. authorized to amend the Credit Line Agreement?
>
> A.    No, they were not.
>
> Q.    Were they authorized to amend, waive or release any Bank's rights to liquidate the collateral?
>
> A.    No.
>
> Q.    Is Dennis Drescher an employee of UBS Bank USA?
>
> A.    He is not.
>          . . .
>
> Q.    Did the Bank ever authorize Mr. Drescher or anyone else at UBS Financial Services to promise to Mr. Wolstein that the Bank would not liquidate any collateral at any point in time?
>
> A.    No, it did not.

(Stewart Testimony, at 32:8–33:1.)

38.    In October 2008, including, but not limited to, on October 10, 2008, the Bank liquidated certain shares of DDR pursuant to the Credit Line Agreement and as a result of the decline in value of the Collateral.  (Ex. D-107; Ex. D-108; Ex. D-109.)

39.    Although the price of DDR shares had declined steadily from October 1, 2008 through October 10, 2008, it rebounded somewhat (albeit temporarily) on October 13 and October 14, 2008.  (Ex. P-8.)  Accordingly, on or about October 13 or 14, 2008, Mr. Drescher contacted Scott Wolstein and notified him that, in order to avoid the risk of future decreases in DDR's value and the possibility of having additional shares of DDR liquidated by the Bank, Wolstein L.P. should consider voluntarily selling the shares and paying off the Loans.  (Drescher Testimony, at 117:18–120:20.)

Defendants have not disputed Mr. Drescher's testimony regarding this conversation.

40.     If Wolstein L.P. had elected to voluntarily sell the shares of DDR at that time, it could have paid off the Loans in their entirety and had a surplus of cash and/or Collateral. (Drescher Testimony, at 119:9–120:6.) In addition, if Wolstein L.P. had decided to prepay the Loans, it could have done so under the Credit Line Agreement and without incurring any prepayment charges. (Ex. P-1, at 8, ¶ 6(a); Wolstein Testimony, at 99:15–20.)

41.     Wolstein L.P. declined to sell the shares and/or pay off the Loans at that time. (Drescher Testimony, at 120:10–20.) Instead, Wolstein L.P. decided to hold onto the shares of DDR and maintain the Loans, thereby continuing to assume the risk that the shares could be liquidated by the Bank.

42.     On October 22, 2008, Mr. Drescher and Mr. Wolstein had several discussions regarding the Loans, during which Mr. Drescher advised Mr. Wolstein that Defendants should consider providing additional collateral due to continuing decreases in the value of DDR stock. (Drescher Testimony, at 131:8–132:14.)

43.     As Mr. Drescher testified, a loan call is a "fluid" situation. Accordingly, although Wolstein L.P. could reduce the risk of having the Collateral liquidated by depositing additional funds, that risk could never be eliminated so long as Wolstein L.P. continued to maintain the Loans. As Mr. Drescher testified:

> There's nothing frozen in time about a capital call. It's very fluid. And so the securities move up, the securities move down, and it's a matter of how much can you deposit to move farther away from a point where we have to liquidate. And so certainly a suggestion of an amount would have been discussed, but the amount typically, I'm not certain always, but typically hinged on what Mr. Wolstein said he was comfortable in sending to us. That number kept diminishing as time

went on.

(Drescher Testimony, at 134:15–135:5.)

44.     On or about October 22, 2008, Wolstein L.P. deposited an additional $1.5 million into the Collateral Accounts.  (Ex. D-118, at 7; Drescher Testimony, at 135:6–15.)  Mr. Wolstein, not the Bank or UBS Financial Services, determined the amount of additional collateral that Wolstein L.P. chose to deposit on October 22, 2008.  (Drescher Testimony, at 121:7–17; 134:15–135:5.)

45.     On October 22, 2008, Mr. Wolstein indicated to Mr. Drescher that Wolstein L.P. did not have any other collateral, aside from the $1.5 million deposit, that could be used to support the Loans.  (Drescher Testimony, at 135:16–136:4.)

46.     On the morning of October 23, 2008, Mr. Drescher advised Mr. Wolstein of the Bank's decision to liquidate the Collateral that day.  (Drescher Testimony, at 121:22–122:12.) During that conversation, Mr. Wolstein again advised Mr. Drescher that there was no additional collateral available.  (Drescher Testimony, at 121:22–122:12.)

47.     During their conversation on the morning of October 23, 2008, Mr. Wolstein did not complain or otherwise suggest to Mr. Drescher that there was any purported agreement to refrain from liquidating the Collateral.  (Drescher Testimony, at 122:13–19; 157:8–13.)

48.     There is no evidence that the Bank ever advised Wolstein L.P. that, in exchange for depositing $1.5 million in a collateral account, the Bank would not liquidate the shares of DDR. (Stewart Testimony, at 30:19–25.)  On the contrary, Mr. Stewart testified:

> Q.     Mr. Stewart, as chief credit officer of UBS Bank, did the Bank ever represent to Scott Wolstein on October 22, 2008, that if he deposited an additional 1.5 million in the collateral account that it would not liquidate any collateral in the accounts?

12

> A. No, it did not.

(Stewart Testimony, at 30:19–25.)

49. In addition, at no time did employees of UBS Financial Services, including Mr. Drescher, advise Mr. Wolstein that the Bank would waive, release or in any way modify the Bank's right to liquidate collateral pursuant to the terms of the Credit Line Agreement. (Drescher Testimony, at 120:21–121:6.) On the contrary, Mr. Drescher testified:

> Q. Mr. Drescher, Mr. Wolstein previously testified here about a conversation that he had with you on October 22nd, 2008. Did you tell Mr. Wolstein that if he placed an additional one-and-a-half million dollars of collateral into the collateral account, UBS would not liquidate the collateral the following day?
>
> A. No.
>
> Q. Did you ever tell that or anything like that to Mr. Wolstein?
>
> A. No.

(Drescher Testimony, at 120:21–121:6.)

## E. The October 23, 2008 Liquidation

50. On October 23, 2008, the Bank exercised its rights under the Credit Line Agreement and sold 755,733 shares of DDR stock on an open and public exchange, the New York Stock Exchange. (Stewart Testimony, at 29:7–12, Ex. D-113.)

51. The proceeds from the October 23, 2008 sale were applied to the balance due and owing on the Loans. (Stewart Testimony, at 29:7–15; Ex. P-4, October 2008 Account Statement.)

52. As a result of its liquidation of the Collateral, the Bank was able to reduce Wolstein L.P.'s obligations on the Loans from $14,185,774 as of October 1, 2008 to $859,306 as of October

31, 2008, a reduction of over $13 million.  (Stewart Testimony, at 29:19–30:13; Ex. P-4, October 2008 Account Statement.)

53.     The sale was performed in accordance with the express terms of the Credit Line Agreement, including, but not limited to, paragraph 10(a) of the Credit Line Agreement.  (Ex. P-1, at 10, ¶ 10(a).)

54.     At the time the Bank liquidated the Collateral, there was no way of knowing whether DDR shares would decrease further in value.  (Stewart Testimony, at 60:15–61:3.)  Mr. Wolstein has expressly conceded this point and testified:

> Q.     Can you state with any certainty on any particular day whether
>        the stock of DDR is going to go up or down that day?
>
> A.     With any certainty, no.

(Wolstein Testimony, at 98:19–22.)

55.     In fact, as Mr. Wolstein also acknowledged, if the Bank had not liquidated the Collateral on October 23, 2008, the value of DDR stock could have continued to decline, thereby reducing the Bank's ability to satisfy Wolstein L.P.'s outstanding debt with the Collateral and increasing Defendants' debt obligations to the Bank above and beyond the damages that the Bank is seeking to recover in this matter.  (Ex. P-9; Wolstein Testimony, at 105:15–106:5.)

56.     As demonstrated by public records regarding DDR's stock price, while DDR shares temporarily rebounded after October 23, 2008, they later declined to levels far below their October 23, 2008 prices.  (Ex. P-9.)  Defendants would be indebted to the Bank for millions of additional dollars if, for example, the Bank had liquidated in the Spring of 2009 when DDR fell below $1.50 per share.  (Ex. P-9.)

**F.     Amounts Due and Owing on the Loans**

57.     By letter, dated October 29, 2008, the Bank demanded payment of $863,599.19 from Wolstein L.P. for the remaining amounts due and owing on the Loans, along with accrued interest. (Ex. P-5).  The Bank further notified Wolstein L.P. that, should it fail to make such payment to the Bank, the Bank would, among other things, undertake certain actions, including, but not limited to, pursuing its legal remedies.  (Ex. P-5; Stewart Testimony, at 33:2–34:3.)

58.     As of November 28, 2008, Defendants admit the outstanding balance on Wolstein L.P.'s loan account was $853,541.69.  (Uncontroverted Facts, ¶ 16.)

59.     Wolstein L.P. has not made any payments to the Bank or otherwise reduced the loan balance on or after November 28, 2008.  (Uncontroverted Facts, ¶ 17.)

60.     Interest has accrued, and continues to accrue, on the amount owed. As of April 26, 2010, the total amount due and owing with interest (but excluding costs of collection and attorneys' fees) was $888,315.49.  (Stewart Testimony, at 35:21–24; Ex. P-4; Ex. P-6.)

61.     Under the Credit Line Agreement, in addition to principal and interest, Wolstein L.P. is liable for "any costs of collection (including reasonable attorneys' fees)" resulting from its failure to repay the Loans.  (Ex. P-1, at 5 (definition of "Credit Line Obligations").)

## CONCLUSIONS OF LAW

**A.     Jurisdiction and Venue**

1.     This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(1). The amount in controversy exceeds $75,000, exclusive of interest and costs, and there is complete diversity of citizenship between the Bank and Defendants. The jurisdiction of the court is not disputed and is hereby determined to be present.  (Pretrial Order, at 2.)

2.     Venue properly lies in this court pursuant to 28 U.S.C. § 1391(a) on the basis of certain agreements between the Bank and Wolstein L.P., which provide, among other things, that actions arising out of or related to such agreements between the parties shall be brought and maintained in this court. (Ex. P-1, at 11, ¶ 17; Pretrial Order, at 2.) Additionally, a substantial part of the events and omissions giving rise to the Bank's claims occurred in the Federal District in which this court resides.

**B.     Burden of Proof**

3.     The Bank has the burden of proof, by a preponderance of the evidence, as to its claims. The claims it asserts are breach of contract (Count One), breach of the covenant of good faith and fair dealing (Count Two), unjust enrichment (Count Three) and account stated (Count Four).

4.     Defendants have the burden of proving, by a preponderance of the evidence, each and every element of their affirmative defenses. Defendants focus specifically on the following defenses: (i) the Credit Line Agreement was orally modified and that such oral modification was reasonable under the circumstances and legally permissible under the terms of the Credit Line Agreement; (ii) the Bank's sale of DDR stock was not commercially reasonable; and (iii) they sustained damages as a result of the Bank's conduct, which should set off their obligations with respect to the Loans.

**C.     Defendants Breached the Credit Line Agreement**

5.     The four "elements of a prima facie case for breach of contract are: [i] a contract; [ii] performance by the party seeking recovery; [iii] breach of the contract by the other party; and [iv] damages." *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388 (citation omitted).

6.     The Credit Line Agreement is an enforceable contract pursuant to which Wolstein

L.P. requested and received millions of dollars in Loans in exchange for agreeing to the terms and conditions of the Credit Line Agreement. Wolstein L.P. does not deny entering into the Credit Line Agreement.  (Uncontroverted Facts, ¶ 7.)

7.     The Bank performed its obligations under the Credit Line Agreement by, among other things, establishing a demand line of credit by which the Bank, upon Wolstein L.P.'s request, made Loans in excess of $20 million to Wolstein L.P.

8.     Wolstein L.P. has breached its obligations and has defaulted under the Credit Line Agreement by, among other things, failing to repay all amounts due and owing on the Loans.  *See Tholen v. Ostler*, No. 2:07-cv-645, 2008 U.S. Dist. LEXIS 74365, *14–15 (D. Utah Sept. 26, 2008). Defendants have not disputed that, on November 28, 2008, the amount due and owing on the Loans was $853,541.69.  (Uncontroverted Facts, ¶ 16.)  Defendants have also not disputed that they have not made any payments since November 28, 2008.  (Uncontroverted Facts, ¶ 17.)

9.     Clear and unambiguous contracts, such as the Credit Line Agreement, shall be enforced in accordance with their terms and conditions.  *See Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 16, 52 P.3d 1179 (citations omitted) (stating unambiguous contracts are enforced according to their plain meaning); *Aspenwood, L.L.C. v. C.A.T., L.L.C.*, 2003 UT App 28, ¶¶ 30–32, 73 P.3d 947 (affirming that a court may grant judgment when a contract's terms are clear and unambiguous).

10.     As a result of Wolstein L.P.'s breach of the Credit Line Agreement, the Bank has suffered losses and has been damaged in an amount equal to the unpaid Loan balance, $888,315.49, plus attorneys' fees, costs and interest, all of which the Bank is entitled to recover pursuant to the express terms of the Credit Line Agreement.

**D.     The Bank's Other Counts**

11.     The Credit Line Agreement is subject to the covenant of good faith and fair dealing. The covenant of good faith and fair dealing is inherent in commercial contracts. *See St. Benedict's Dev. Co. v. St. Benedicts Hosp.*, 811 P.2d 194, 199 (Utah 1991) (citations omitted).  "Under the covenant of good faith and fair dealing, each party impliedly promises that he will not intentionally or purposely do anything which will destroy or injure the other party's right to receive the fruits of the contract." *Id.* (citations omitted); *see also* Restatement (Second) of Contracts, § 205 cmt. a (1981).  Wolstein L.P. has breached the covenant of good faith and fair dealing by, among other things, knowingly and intentionally failing and refusing to repay the Loans as required by the Credit Line Agreement.

12.     Because the Bank has proven breach of contract, which is a legal remedy, "the law will not imply the equitable remedy of unjust enrichment." *Robertson's Marine, Inc. v. I4Solutions, Inc.*, 2010 UT App 9, ¶ 14, 223 P.3d 1141 (quoting *American Towers Owners Ass'n v. CCI Mech., Inc.*, 930 P.2d 1182, 1193 (Utah 1996)).  The court therefore will not address the Bank's unjust enrichment claim.

13.     The Bank has also established a claim for an account stated as the evidence has proven that: (i) the Bank extended the Loans to Wolstein L.P., giving rise to an indebtedness from Wolstein L.P. to the Bank pursuant to the Credit Line Agreement; (ii) as of April 26, 2010, the amount of $888,315.49 remains due and owing on the Loans (exclusive of attorneys' fees, costs and expenses), with interest continuing to accrue; and (iii) Wolstein L.P. expressly agreed to immediately and fully repay the outstanding amounts pursuant to the Credit Line Agreement upon the Bank's demand.  *See DeMentas v. Estate of Tallas*, 764 P.2d 628, 634 (Utah Ct. App. 1988) (citing 1A

C.J.S. *Account Stated* § 2 (1985)).

**E.    Wolstein L.P.'s General Partners Are Jointly and Severally Liable to the Bank**

14.    Under Delaware law (under which Wolstein L.P. was organized), "a general partner of a limited partnership has the liabilities of a partner in a partnership that is governed by the Delaware Uniform Partnership Law . . . to persons other than the partnership and the other partners." Del. Code Ann. tit. 6, § 17-403(b) (2010).  The Delaware Revised Uniform Partnership Act states that "all partners are liable jointly and severally for all obligations of the partnership."  *Id.* § 15-306(a).

15.    Similarly, under Utah law, the designation of an entity as a limited partnership does not shield its general partners from liability to outside creditors.  Under Utah law, "a general partner of a limited partnership has the liabilities of a partner in a partnership without limited partners to persons other than the partnership and the other partners."  Utah Code Ann. § 48-2a-403 (2011). Furthermore, Utah's general partnership law provides that "all partners are liable . . . (b) jointly for all other debts and obligations of the partnership."  *Id.* § 48-1-12(1).

16.    Under either Delaware law or Utah law, Defendants are jointly and severally liable as the evidence has established: (i) Wolstein L.P. is a limited partnership organized under the laws of the State of Delaware; (ii) S.A.W. Trust was the general partner of Wolstein L.P. from December 18, 2002 to February 1, 2007; and (iii) since February 1, 2007, Wolstein Business Enterprises, Inc. has been the general partner of Wolstein L.P..

17.    The fact that S.A.W. Trust ceased being a general partner of Wolstein L.P. on February 1, 2007 does not relieve it of liability in this case. It is well-settled that merely withdrawing from a partnership does not relieve a former general partner of liability for partnership debts incurred

prior to the withdrawal. Under Delaware law, "[a] partner's dissociation does not of itself discharge the partner's liability for a partnership obligation incurred before dissociation." Del. Code Ann. tit. 6 § 15-703(a). Similarly, Utah law provides that "[t]he dissolution of a partnership does not of itself discharge existing liability of any partner." Utah Code Ann. § 48-1-33(1); *see also Shar's Cars, LLC v. Elder*, 2004 UT App 258, ¶ 19, 97 P.3d 724 (holding that the outgoing partner was responsible for debts incurred prior to the partnership's dissolution).

18.     When S.A.W. Trust ceased to be the general partner of Wolstein L.P. on February 1, 2007, Wolstein L.P. had already borrowed over $20 million from the Bank. Defendants never notified the Bank that S.A.W. Trust was withdrawing as a general partner. The amount of $20,304,091 was still outstanding on the Loans as of February 1, 2007 and S.A.W. Trust remains jointly and severally liable to the Bank for the full amount due and owing.

19.     As Wolstein L.P. did not pay off the Loans as of February 1, 2007 and continued to enjoy the benefits of a variable credit line thereafter, Wolstein Business Enterprises Inc. is also jointly and severally liable for the full amount of the loan balance that Wolstein L.P. continued to maintain after February 1, 2007.

20.     Accordingly, all Defendants are jointly and severally liable for the amounts due and owing to the Bank.

**F.     The Credit Line Agreement Was Not Orally Modified**

   **(i)     The Credit Line Agreement Bars Oral Modifications**

21.     Defendants have not disputed that the Credit Line Agreement provided that "this Agreement may be amended only by the Bank at any time by sending written notice signed by an authorized officer of the Bank of an amendment to the Borrower" and that "this Agreement may not

be amended orally." (Ex. P-1, at 11, ¶ 15 (emphasis added).)

22.     It is undisputed that there was no written agreement between Defendants and the Bank whereby the Bank agreed to waive, amend or modify any of its rights and remedies under the Credit Line Agreement. (Stewart Testimony, at 31:4–7; Wolstein Testimony, at 103:2–4.) Specifically, there was no written agreement that the Bank would not liquidate the Collateral on October 23, 2008. Defendants have not offered any evidence of such a written agreement.

23.     Accordingly, Defendants' oral modification claim is barred by the express terms of the Credit Line Agreement.

**(ii)     Defendants' Argument Also Fails Because There Was No Oral Agreement**

**a.     The Bank Did Not Promise to Refrain from Selling DDR Shares**

24.     There was no oral agreement whereby the Bank waived its right to liquidate collateral with or without notice. More specifically, the Bank never advised Mr. Wolstein that, in exchange for receiving $1.5 million, the Bank would not liquidate the collateral in the accounts. (Stewart Testimony, at 30:19–25.) In fact, at no point did the Bank ever agree to amend the Credit Line Agreement. (Stewart Testimony, at 31:1–7.)

25.     Accordingly, as Defendants have not offered any evidence that an officer of the Bank, as required by the Credit Line Agreement, agreed to waive the Bank's rights under the Credit Line Agreement, including the right to sell collateral with or without notice, Defendants' oral modification claim is without basis.

**b.     Mr. Drescher Did Not Promise that the Bank Would Refrain from Liquidating Shares of DDR**

26.     At no time did Mr. Drescher advise Mr. Wolstein that the Bank would waive, release

or in any way modify the Bank's right to liquidate collateral pursuant to the terms of the Credit Line Agreement in exchange for Defendants depositing $1.5 million. (Drescher Testimony, at 120:21–121:6.)

27.     Mr. Wolstein did not complain or otherwise suggest to Mr. Drescher that there was a purported agreement to refrain from liquidating the shares upon being advised on October 23, 2008 that the Bank would liquidate the shares later that day.  (Drescher Testimony, at 157:4–13.)

> **(iii)    Any Oral Modifications Allegedly Made by Mr. Drescher Would Not Be Enforceable Because He Did Not Have Actual or Apparent Authority to Modify the Credit Line Agreement**

28.     Mr. Drescher was an employee of UBS Financial Services and was not authorized by the Bank to amend the Credit Line Agreement.  (Stewart Testimony, at 32:22–33:1; Drescher Testimony, at 116:2–9.)  Defendants have not contested the fact that Mr. Drescher did not have actual authority to amend the Credit Line Agreement.

29.     Mr. Drescher did not have apparent authority to amend the Credit Line Agreement. Apparent authority exists only where "conduct of the principal . . . , reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him." *Luddington v. Bodenvest Ltd.*, 855 P.2d 204, 209 (Utah 1993) (quotations and citation omitted) (finding no apparent authority).

30.     Mr. Drescher did not have apparent authority to act on behalf of the Bank because the conduct of the Bank, reasonably interpreted, could not have caused Defendants to reasonably believe that the Bank consented to having Mr. Drescher act on the Bank's behalf. Any belief by Defendants to the contrary was not reasonable. The following facts support this conclusion:

(a)     UBS Financial Services was not a party to the Credit Line Agreement.  (Ex. P-1;

Wolstein Testimony, at 97:22–24.)  UBS Financial Services never advised Defendants that it was a party to the Credit Line Agreement.

(b)     Mr. Drescher never advised Mr. Wolstein that he was authorized to amend the Credit Line Agreement or make other decisions regarding the Loans.  (Drescher Testimony, at 117:5–9.)

(c)     During telephone calls in October 2008, Mr. Drescher expressly advised Mr. Wolstein that the Loans were issued by the Bank and not by UBS Financial Services.  (Drescher Testimony, at 117:10–13; 130:20–131:4.)

(d)     Mr. Drescher advised Mr. Wolstein that the Bank, not UBS Financial Services, made all decisions regarding the liquidation of the collateral in connection with loan calls.  (Drescher Testimony, at 117:14–17.)

(e)     The Credit Line Agreement provides that any amendments to it must be in writing and "signed by an authorized officer of the Bank."  (Ex. P-1, at 11, ¶ 15.)  Mr. Drescher never represented to Defendants that he was an "officer of the Bank" and he never signed any document purporting to amend the Credit Line Agreement.

### (iv)     Any Oral Modification Would Be Barred by the Statute Of Frauds

31.     Defendants' claim that the Credit Line Agreement was orally modified is barred by the Utah Statute of Frauds, which requires "every credit agreement" to be in writing.  Utah Code Ann. § 25-5-4(1)(f).  This would include both the Credit Line Agreement and any modifications thereto.

32.     "'Credit agreement' means an agreement by a financial institution to: [i] lend, delay, or otherwise modify an obligation to repay money, goods, or things in action; [ii] otherwise extend credit; or [iii] make any other financial accommodation."  Utah Code Ann. § 25-5-4(2)(a)(i)(A).  The

Credit Line Agreement, as well as any purported amendment alleged by Defendants, fall within the Statute of Frauds.

33. The Supreme Court of Utah has held that the Statute of Frauds' writing requirement applies to amendments of credit agreements as well: "if an original agreement is within the statute of frauds, a subsequent agreement that modifies the original agreement must also satisfy the requirements of the statute of frauds to be enforceable." *R.T. Nielson Co. v. Cook*, 2002 UT 11, ¶ 13 n.4, 40 P.3d 1119 (citation omitted). There is no such writing here.

34. Defendants' efforts to circumvent the Statute of Frauds by arguing that they relied, to their detriment, on an oral promise allegedly made by Mr. Drescher, which waived the Bank's right to liquidate the Collateral under the Credit Line Agreement, is misplaced. Under Utah law, to remove "an oral contract from the reach of the statute of frauds," one must show part performance. *MediaNews Group, Inc. v. McCarthey*, 494 F.3d 1254, 1263 (10th Cir. 2007). "Actions which are 'equally consonant' with written agreements cannot form the basis of a finding of part performance, because they do not indicate the existence of a separate oral agreement upon which the parties relied." *Id.* at 1264 (citation omitted). In this case, Defendants' action of depositing additional money in the Collateral Accounts was equally consonant with the written agreement. Defendants, therefore, cannot escape the Statute of Frauds' requirements and their oral modification defense fails.

35. Here, the oral promise allegedly made by Mr. Drescher is an essential element to any claim for setoff that Defendants may have. Accordingly, Defendants' setoff claim based on an alleged oral agreement is also barred under the Statute of Frauds.

**G.     The Bank's Sale Of DDR Shares Was Reasonable and Proper**

36. The Bank's liquidation of the Collateral was in accordance with both the Credit Line

Agreement and Article 9 of the Uniform Commercial Code ("UCC") and was, therefore, commercially reasonable.

37.     As a secured demand loan, the Credit Line Agreement authorized the Bank to sell the Collateral at its "sole and absolute discretion by public sale on any exchange or market where business is then usually transacted."  (Ex. P-1, at 10, ¶ 10(a); Ex. P-1, at 4, ¶ D.)

38.     It is undisputed that the Bank sold the shares of DDR on a recognized exchange (i.e., the New York Stock Exchange) in accordance with the terms of the Credit Line Agreement.  Where the Collateral is sold on a recognized exchange, the Credit Line Agreement expressly authorizes the sale of shares "without providing the [borrower] with prior notice of the sale."  (Ex. P-1, at 10, ¶ 10(a); Stewart Testimony, at 58:21–59:13.)

39.     The Credit Line Agreement's notice provision is in accordance with Utah's version of the UCC.  Under Utah law, notice is not required for the disposition of collateral where the collateral "threatens to decline speedily in value or is of a type customarily sold on a recognized market."  Utah Code Ann. § 70A-9a-611(4).

40.     Under Article 9 of the UCC, "[a] disposition of collateral is made in a commercially reasonable manner if the disposition is made: (a) in the usual manner on any recognized market; [or] (b) at the price current in any recognized market at the time of the disposition."  Utah Code Ann. § 70A-9a-627.

41.     It is well-recognized that these provisions of the UCC create a "'a safe harbor' that, by following, a secured party can be assured that a disposition will be deemed to have been conducted in a commercially reasonable manner."  11 Lary Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 9-627:3 [Rev.] (3d. ed.); James J. White & Robert S. Summers,

Uniform Commercial Code § 34-11(a) (6th ed.) (describing UCC § 9-627(b) as a "safe harbor").

42.     Accordingly, as the Bank complied with the Credit Line Agreement and Article 9 of the UCC, and Defendants having offered no competent evidence to the contrary, the court finds that the Bank's sale of DDR shares was reasonable and proper.

## H.     Defendants Have Not Proven Any Losses

43.     During the course of the trial of this matter, Defendants argued that they were "damaged" by the Bank's liquidation of the Collateral.  Defendants, however, do not have any counterclaims against the Bank and their motion for leave to file counterclaims was denied.

44.     Although Defendants also claim that the doctrine of setoff somehow reduces or eliminates their liability to the Bank, setoff is only applicable where necessary to avoid "the absurdity of making A pay B when B owes A."  *See Citizens Bank v. Strumpf*, 516 U.S. 16, 18 (1995) (quotations and citation omitted).  Here, the doctrine of setoff is inapplicable because Defendants have not satisfied their burden of proving that the Bank owes Defendants anything.

45.     While it is undisputed that the Bank sold the shares of DDR at issue at an average price of $4.78 on October 23, 2008, Defendants have not offered any expert testimony or other competent evidence showing how they were damaged by the sale.

46.     Defendants have made no effort whatsoever to quantify their claimed "losses."  In fact, Defendants have only suggested, without any support or specificity, that they are entitled to a setoff in an amount equal to the amount that they owe to the Bank.  Defendants have neither quantified the amount of a purported setoff nor provided any legal basis for it.

47.     As all parties have acknowledged, DDR shares have been subject to significant fluctuations in price.  Accordingly, while Defendants find it convenient to suggest that higher prices

could have been obtained, this is pure speculation. In fact, Defendants could have realized far greater losses had the Bank liquidated at other times when DDR closed significantly lower than the price obtained on October 23, 2008. (Ex. P- 9) (showing stock prices from September 2, 2008 to August 31, 2009).)

48. Defendants would be indebted to the Bank for millions of additional dollars if, for example, the Bank had liquidated at DDR's all time low in the Spring of 2009, when DDR shares were trading below $1.50 per share. (Ex. P-9; Wolstein Testimony, at 105:15–106:5.)

49. Furthermore, at the time the Bank liquidated the shares of DDR, in the face of unprecedented market conditions, there was no way of knowing whether DDR shares would decrease further in value. (Stewart Testimony, at 60:15–61:3.) Mr. Wolstein has expressly conceded this point and Defendants have not offered any competent testimony to the contrary. (Wolstein Testimony, at 98:19–22.)

50. Under well-established law, a party is not entitled to damages, including setoff amounts, that are uncertain and speculative. *See Atkin Wright & Miles v. Mountain States Tel. & Tel. Co.*, 709 P.2d 330, 336–37 (Utah 1985) (denying damages based on the grounds they were merely speculative).

51. Accordingly, while Defendants have suggested that they could have obtained a better price for the shares of DDR, their statements in this regard are mere speculation and not supported by competent evidence, including testimony by a qualified expert.

52. Under applicable law, Defendants are not entitled to any setoff.

I.    **Defendants' Affirmative Defenses Are Not Supported by Competent Evidence**

53. Defendants have not offered any competent evidence in support of their affirmative

defenses, including expert testimony, suggesting that the Bank's conduct was unreasonable or legally impermissible.

54.     Defendants have not offered any expert testimony or other competent evidence to support a conclusion that the Bank's liquidation of shares of DDR violated the Credit Line Agreement.

55.     Defendants have not offered any expert testimony or other competent evidence to support a conclusion that the Bank's conduct violated the UCC.

56.     Defendants have not offered any expert testimony or other competent evidence to support a conclusion that the Bank's conduct was commercially unreasonable.

57.     Defendants have not offered any expert testimony or other competent evidence that the amount of proceeds that the Bank obtained from the liquidation of the Collateral was commercially unreasonable or otherwise improper.

58.     Defendants have not offered any expert testimony or other competent evidence to support a conclusion either that Defendants sustained any damages as a result of the Bank's conduct or the amount of any such damages.

59.     Under Federal Rule of Evidence 701(c), a lay witness may not offer an opinion on matters that require "scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c); *see also LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004); *Broadcast Capital Corp. v. Summa Med. Corp.*, 972 F.2d 1183, 1194–95 (10th Cir. 1992) (barring attorney from testifying as an expert regarding security transaction because he did not have any experience "representing large brokerage houses, clearing corporations, or transfer agents"). The court, therefore, barred opinion testimony by Mr. Wolstein (who was not identified by

Defendants as an expert witness).  (Wolstein Testimony, at 162:12–21.)

60.     Accordingly, Defendants' affirmative defenses have not been supported by the appropriate expert testimony.

**J.      Defendants Are Liable For Attorneys' Fees and Costs**

61.     Under the Credit Line Agreement, Defendants are liable for "any costs of collection, (including reasonable attorneys' fees)" resulting from their failure to repay the Loans.  (*See* P-1, at 5 (Definition of "Credit Line Obligations").)  It is well settled that provisions such as this one are honored by Utah courts.  *See, e.g.*, *Soffe v. Ridd*, 659 P.2d 1082, 1085 (Utah 1983) (citation omitted); *Superior Receivable Servs. v. Pett*, 2008 UT App 225, ¶ 11, 191 P.3d 31.  Accordingly, the Bank is entitled to attorneys' fees, costs and expenses arising from Defendants' failure and refusal to repay the Loans.

<u>**CONCLUSION**</u>

The court, having considered all the evidence and arguments of the parties, enters judgment in favor of Plaintiff UBS Bank USA and against Defendants Wolstein Business Enterprises, L.P., S.A.W. Trust and Wolstein Business Enterprises, Inc., individually and jointly and severally, in the amount of $888,315.49, plus interest, costs and attorneys' fees.  Judgment is also entered against Albert T. Adams for the same amount, but solely in his capacity as Trustee of the S.A.W. Trust, rather than individually.

DATED this 13th day of January, 2011.

BY THE COURT:

Clark Waddoups
United States District Judge